# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DEL RIEGO PONTE**, *et al.*,

    *Plaintiffs,*

**v.**

**INSTITUTO DE PLANIFICACION FISICA**, *et al.*,

    *Defendants.*

**Case No. 1:22-cv-3347-RCL**

## <u>MEMORANDUM OPINION</u>

Plaintiffs, a set of six half-siblings who are United States nationals with purported property interests in Cuba, bring suit under the private cause of action found in Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act (the "Helms-Burton Act" or the "Act."). Specifically, the plaintiffs allege that their parents jointly owned seven properties in Cuba (the "Confiscated Properties" or "Properties" and each individually a "Property"), ranging from waterfront resorts to an office space, which were supposedly confiscated by Fidel Castro's regime in 1960. They claim to have inherited interest in the Properties upon the death of their last surviving parent in 2013. The defendants—all agencies or instrumentalities of the Cuban state as defined in the Act—have allegedly been "trafficking" in the plaintiffs' stolen property in violation of the Helms-Burton Act by allowing Cuban military officials to use the office space and vacation in the waterfront properties. The plaintiffs further allege that the waterfront properties are being used to provide lodging to tourists from the United States. They claim never to have been compensated by the Cuban government for the expropriation of the Properties.

The plaintiffs have asked the Court to hold the defendants—and, by extension, the Cuban government—accountable for these actions. Generally, under the Foreign Sovereign Immunities

Act ("FSIA"), American Courts do not have jurisdiction to entertain claims against foreign

sovereigns unless one of several statutory exceptions applies. Here, the plaintiffs invoke two of

the FSIA's exceptions and ask the Court to find that the FSIA abrogates the defendants'

immunity under either or both of them. The defendants have failed to appear, and the plaintiffs

have therefore moved for default judgment.

Unfortunately for the plaintiffs, they have not provided evidence that either of the two

FSIA exceptions they have invoked applies in this case. Nor have they provided satisfactory

evidence as to the validity of their ownership interests in the Confiscated Properties. Therefore,

and for the reasons that follow, the Court will **DENY** the Motion for Default Judgment without

prejudice and with leave to refile. The Court will further **ORDER** that the plaintiffs' claims be

referred to the U.S. Foreign Claims Settlement Commission to determine the validity of their

ownership interests in the Confiscated Properties pursuant to 22 U.S.C. § 6083(a)(2). The Court

will further **ORDER** the plaintiffs to refile their Motion within sixty days of this Court's receipt

of the Commission's report.

## I.    LEGAL STANDARD

In civil disputes such as this one, the FSIA provides "the sole basis for obtaining

jurisdiction over a foreign state in [United States] courts." *Argentine Republic v. Amerada Hess

Shipping Corp.* 488 U.S. 428 (1989). Indeed, the FSIA frames sovereign immunity as the

default, stating that "a foreign state *shall be immune* from the jurisdiction of the court of the

United States and the States" unless an enumerated exception applies. 28 U.S.C. § 1604. The

plaintiffs bear the burden of overcoming the FSIA's presumption of sovereign immunity "by

producing evidence that an exception applies." *Bell Helicopter Textron, Inc. v. Islamic Republic

of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).

Plaintiffs who successfully invoke an FSIA exception to foreign sovereign immunity must still prove their claims on the merits. When proceeding against a foreign sovereign defendant who fails to file a responsive pleading within sixty days after service has been made, plaintiffs may move for default judgment. 28 U.S.C. § 1608(d). However, a Court may not enter a default judgment against a foreign sovereign defendant unless the plaintiff "establishes his claim or right to relief by evidence satisfactory to the court." *Id.* § 1608(e). A district court retains discretion "to determine precisely how much and what kinds of evidence the plaintiff must provide" to establish their claim or right to relief. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). Courts can rely on, among other things, plaintiffs' "uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (quoting *Int'l Road Fed'n v. Embassy of the Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001)).

## II.    STATUTORY BACKGROUND—THE HELMS-BURTON ACT

In 1964, Congress established a mechanism for U.S. nationals to submit expropriation claims against Cuba to the U.S. Foreign Claims Settlement Commission (the "Commission"). *See* 22 U.S.C. § 1643 *et seq.* The statute allowed U.S. nationals who owned property confiscated by the regime of Fidel Castro to submit claims to the U.S. Foreign Claims Settlement Commission to determine the validity of those claims. But individuals had no way of enforcing their property rights against the Cuban government or its subsidiaries. To remedy this, in 1996 Congress passed, and President Clinton signed into law, the Cuban Liberty and Democratic Solidarity Act (LIBERTAD), also known as the Helms-Burton Act. 22 U.S.C. § 6021, *et seq.* Title III of the Act created a private cause of action for United States nationals

who owned property in Cuba against "any person that . . . traffics in property which was confiscated by the Cuban Government." *Id.* § 6082(a)(1)(A).

The term "person" is defined elsewhere in the Act to encompass "any person or entity, including any agency or instrumentality of a foreign state." *Id.* § 6023(11). And the term "agency or instrumentality of a foreign state" includes any entity which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof. *Id.* § 6023(1) (incorporating by reference the definition of agency or instrumentality of a foreign state found at 28 U.S.C. § 1603(b)).

Additionally, the Act broadly defines the term "traffics," including in the definition any act by which a person, without the authorization of any United States national who holds a claim to the property, does any of the following:

> (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,
>
> (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or
>
> (iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person

22 U.S.C. § 6023(13)(A)(i)–(iii). The Act provides several methods of calculating damages, and relevant here is the provision allowing for money damages "equal to the sum of . . . the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater." *Id.* § 6082(a)(1)(A).

Finally, the Act authorizes the President of the United States to suspend Title III's private cause of action for a period "of not more than six months" if the President represents to Congress

that such suspension "is necessary to the national interests of the United States." *Id.* § 6085(b).

The original effective date of the private cause of action was August 1, 1996. *Id.* But President

Clinton suspended the effective date every six months for the duration of his presidency, as did

every President after him until President Trump. After a series of shorter suspensions issued

throughout the spring of 2019, Secretary of State Michael Pompeo announced in April 2019 that

the Trump administration would no longer seek an extension of the suspension. On May 2,

2019, the suspension lifted. *See Cuba: Title III FAQs (LIBERTAD)*, U.S. DEP'T OF STATE,

https://2017-2021.state.gov/cuba-title-iii-faqs-libertad/ [https://perma.cc/N8NT-AZ7D]. The

plaintiffs filed their lawsuit on November 1, 2022, while the suspension was lifted.[1]

## III.    FACTUAL BACKGROUND

### A. Alleged Facts

It is difficult to discern the alleged facts based on the plaintiffs' filings. The plaintiffs

themselves do not seem to know the factual background, as their narrative has changed

significantly between the Complaint, the Motion for Default Judgment, and the exhibits included

with that Motion. To some degree, this is natural during a lawsuit as time and additional

research reveal new information. However, the muddied record makes it impossible for the

Court to determine which of the plaintiffs, if any, own the Confiscated Properties.

---

[1] The Biden administration stated its intention to reinstate the suspension on January 14, 2025. Letter from
President Joseph R. Biden, Jr. to the Chairmen and Chair of Certain Congressional Committees on the Suspension of
the Right to Bring an Action Under Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of
1996 (Jan. 14, 2025), https://bidenwhitehouse.archives.gov/briefing-room/statements-releases/2025/01/14/letter-to-
the-chairmen-and-chair-of-certain-congressional-committees-on-the-suspension-of-the-right-to-bring-an-action-
under-title-iii-of-the-cuban-liberty-and-democratic-solidarity-libertad-act-of/ [https://perma.cc/ZB8Y-DAHC].
However, the new suspension was not set to go into effect until January 29, 2025, and Secretary of State Marco
Rubio rescinded the reinstatement of the suspension on that date, before the suspension could go into effect. Press
Release, Secretary of State Marco Rubio, Restoring a Tough U.S.-Cuba Policy (Jan. 31, 2025),
https://www.state.gov/restoring-a-tough-u-s-cuba-policy/ [https://perma.cc/S5EU-K4ZM].

The following allegations are largely drawn from the plaintiffs' Complaint and Motion for Default Judgment, as well as the exhibits attached to the Motion.[2]  The plaintiffs are six individuals, five of whom purport to be the children of both Enrique V. Del Riego y Rodriguez ("Enrique V.") and Maria Carmen Ponte Barreiro Del Riego ("Maria Carmen").  Compl. ¶¶ 14–19, ECF No. 1.  These five plaintiffs all claim to be residents of Miami, Florida.  Enrique Aff. ¶ 10.  The sixth plaintiff, Antonio Rodriguez Ponte, claims to be a son of Maria Carmen from a previous marriage.  Last Will and Testament of Enrique Del Riego 2, ECF No. 54-3 ("Enrique V. Will").[3]

The Complaint names seven defendants, all of which are allegedly agencies or instrumentalities of the government of Cuba as defined by the Act.  Compl. ¶¶ 20–26.  The defendants are: (i) Instituto de Planificacion Fisica ("IDPF"); (ii) Ministerio de la Construccion ("MDLC"); (iii) Asociacion Nacional de Agricultores Pequenos ("ANAP"); (iv) Inmobiliara CIMEX, S.A. ("I-CIMEX"); (v) Corporacion CIMEX, S.A. ("CIMEX"); (vi) Grupo de Administracion Empresarial, S.A. ("GAESA"); and (vii) Unidad Presupuestada Gran Parque Metropolitano de la Habana ("UNIDAD").  Of these seven defendants, plaintiffs were able to serve only the first five, and they subsequently dismissed their claims against defendants GAESA and UNIDAD.  Notice of Voluntary Dismissal, ECF No. 52.

At issue are seven Properties, each of which the plaintiffs allege that Enrique V. and Maria Carmen had ownership rights in when the Cuban government confiscated them in 1960.  Mot. for Default J. 9.  The Confiscated Properties are listed below by the name that the plaintiffs

[2] As noted below, the Motion for Default Judgment does nothing more than reassert the factual allegations in the Complaint while adding little evidentiary support for them.
[3] Because the Enrique V. Will is handwritten in Spanish in close-to-illegible handwriting and is accompanied by an unauthenticated translation, the Court will refer to the Will by the page number of the exhibit rather than the page numbers on the handwritten Will.

assign them in their Motion for Default, alongside the defendant(s) allegedly trafficking the

Property:

- "Bosque de la Habana" is being trafficked by defendant IDPF.[4]  Compl. ¶ 27(a); Mot. for Default J. ¶ 14(d).
- "Penas Altas" is being trafficked by defendants IDPF and ANAP.  Compl. ¶ 27(b); Mot. for Default J. ¶ 14(c).
- "Brisas Del Mar" is being trafficked by defendants IDPF and MDLC.  Compl. ¶ 27(c); Mot. for Default J. ¶ 14(b).
- "Playa Marbella" is being trafficked by defendants IDPF and ANAP.  Compl. ¶ 27(d); Mot. for Default J. ¶ 14(e).
- "Tarara" is being trafficked by defendants I-CIMEX and CIMEX.[5]  Compl. ¶ 27(e); Mot. for Default J. ¶ 14(f).
- "Rafaelita" is being trafficked by defendants IDPF and MDLC.  Compl. ¶ 27(f); Mot. for Default J. ¶ 14(a).
- "FOCSA" is being trafficked by defendants I-CIMEX and CIMEX.[6]  Compl. ¶ 27(g); Mot. for Default J. ¶ 14(g).

The plaintiffs allege that the Confiscated Properties were confiscated by the Cuban

Government in 1960.  Mot. for Default J. ¶ 20.  The Properties are "either waterfront properties

or are located in pristine natural habitats," and the plaintiffs allege that the defendants have

subsequently used the Properties to "provide lodging for tourists, including tourists from the

United States, or as temporary vacation areas for members of the Cuban military."  Compl. ¶ 64.

In their Complaint, the plaintiffs indicate that their "investigation is ongoing," and that discovery

"is likely to reveal additional trafficking and commercial activities conducted by Defendants or

their agents."  *Id.* ¶ 63.  Based on the facts alleged above, the Complaint lists one count:

Trafficking in Confiscated Property in violation of 22 U.S.C. § 6082.  *Id.* ¶ 74.

---

[4] The plaintiffs originally claimed that UNIDAD is trafficking in this Property, but since UNIDAD is not a party to this suit the Court will not consider that claim.
[5] The plaintiffs originally claimed that GAESA is trafficking in this Property, but since GAESA is not a party to this suit the Court will not consider that claim.
[6] The plaintiffs originally claimed that GAESA is trafficking in this Property, but since GAESA is not a party to this suit the Court will not consider that claim.

The plaintiffs then filed their Motion for Default Judgment, submitting ten exhibits to support the allegations made in the Complaint. First, they submit deeds for six of the seven Confiscated Properties. ECF Nos. 54-4–10 (collectively the "Deeds").[7] They also submit the last will and testament of Enrique V., who allegedly owned the properties at the time of his death in 2013 and bequeathed ownership rights to all six plaintiffs, including his stepson Antonio. ECF No. 54-3. Additionally, they submit an expert affidavit from Arnaldo M. Fernandez, which avers that the Deeds and Enrique V. Will are authentic and valid under Cuban law in effect at the time of those documents' execution. ECF No. 54-1 ("Fernandez Aff."). Finally, they submit an "Affidavit Regarding the Claim for the Loss and Unlawful Trafficking" of the Confiscated Properties, sworn to and submitted by Enrique Del Riego, the named plaintiff in this suit and son of Enrique V. ECF No. 54-2 ("Enrique Aff.").[8]

## B. Factual Deficiencies

There are numerous factual deficiencies in the plaintiffs' filings regarding ownership of the various properties, which undermine the validity of the plaintiffs' claims. Although the Court is denying the plaintiffs' Motion without prejudice because of lack of subject matter jurisdiction under the FSIA, the Court will briefly address the factual deficiencies in anticipation of a future filing by the plaintiffs.

In their Complaint, the plaintiffs allege that the Confiscated Properties were owned in equal 50% shares by Enrique V., who is the father of five out of six of the plaintiffs, and Maria

---

[7] As discussed below, the plaintiffs do not include a deed for FOCSA in their exhibit list.

[8] In addition to the numerous factual deficiencies described below, the Enrique Affidavit alternates between use of the first and third person. While this alone is not enough for the Court to find the affidavit invalid, it does call into question the credibility of the affiant. It indicates either that Enrique haphazardly wrote the affidavit, which the Court would find hard to believe given the gravity of his claims, or that someone else either wrote it for him or induced him to write it such that the Court cannot take seriously that the assertions within it are entirely those of Enrique.

Carmen, who is the mother of all six of the plaintiffs. Compl. ¶ 28. However, in their Motion for Default Judgment currently before the Court, the plaintiffs change their story. They now suggest that Enrique V. and Maria Carmen had equal ownership interest in only five of the properties—Penas Atlas, Brisas Del Mar, Tarara, Rafaelita, and FOCSA—when the Properties were confiscated. Mot. for Default J. ¶ 16. Meanwhile, two properties—Bosque de la Habana and Playa Marabella—were allegedly jointly owned by Enrique V. and his brother Santos Perfecto Del Riego y Rodriguez. *Id.* ¶¶ 17–18. The Complaint does not mention Santos at all. Therefore, the Motion for Default Judgment is the only filing that indicates Santos transferred his interests in Bosque de la Habana or Playa Marabella to Enrique V, a claim which is not supported by any "documentary [or] affidavit" material. *Valore*, 700 F. Supp. 2d at 59. There is certainly not enough evidence to satisfy the Court that the plaintiffs are the rightful owners of those two properties.

The Complaint also states that upon Maria Carmen's passing in 1984, her 50% ownership interest passed to her six sons in equal parts. Compl. ¶ 29. The Motion for Default, however, states that upon Maria Carmen's death, her 50% ownership passed "to her surviving spouse and her five (5) sons (the Plaintiffs) equally." Mot. for Default J. ¶ 22. It is unclear, without a copy of Maria Carmen's will, which of her six sons would have been left out under this scenario. Yet another possible distribution of Maria Carmen's ownership interest in the Confiscated Properties is described in the Enrique V. Will, which indicates that her 50% interest was divided equally among the six plaintiffs *and Enrique V.* Enrique V. Will 9. This would indicate that her interest was divided into seven equal parts, each worth 7.14% of the total value of the Confiscated Properties. *Id.* at 9–10.

The Deeds each tell an entirely *different* story. The exhibit that purports to be the Deed for Bosque de la Habana lists only Santos as the buyer of that Property. Ex. 8 at 1, Mot. for Default J., ECF No. 54-8. And while Enrique V.'s name *appears* in the translated version of the Playa Marbella deed, the Court cannot decipher whether he is a signatory to the sale or merely a witness to his brother Santos's purchase of that Property. It is therefore entirely possible that these two Properties were never owned by Enrique V. in the first place and are instead owned by Santos, who is not a party in this case and whose whereabouts are unknown to the Court. Finally, while there are exhibits that tend to show that Penas Altas (Ex. 6–7), Brisas Del Mar (Ex. 5), Rafaelita (Ex. 4), and Tarara (Ex. 10) were in fact owned by Enrique V., the Court has only an affidavit from Enrique that he and his siblings own FOCSA. Enrique Aff. ¶ 11(a)(vii).

Perhaps most strangely of all, the translated version of the Will introduced into evidence states that "[i]n the marriage of Enrique and Maria del Carmen *there are only two properties in Cuba.*" *Id.* at 9. The Court will note that it has serious reservations about the authenticity of the translated version of the Will. Unlike other translations introduced into evidence, there is no sworn affidavit or accompanying notarization indicating the authenticity of the translation. *Compare id. with, e.g.*, Rafaelita Deed, Ex. 4 at 46, Mot. for Default J. (containing a signed "Certificate of Translator's Competence" accompanied by a signature of a Notary Public in Florida). And none of the Confiscated Properties is explicitly named in the Will. The lack of authenticating documentation, coupled with the divergent stories told by the Will, the Motion, and the Complaint, leave the Court with no choice but to refuse to find, at this stage, that the plaintiffs are the rightful owners of the Properties.

The plaintiffs try to cure these deficiencies, at least in part, through the affidavit of expert witness Arnaldo M. Fernandez. In his affidavit, Fernandez submits five opinions to the Court.

First, he submits that the Deeds "have all the earmarks of authentic legal documents typewritten and circulating in Cuba during the 1950s." Fernandez Aff. 4. Second, he submits that the Enrique V. Will is valid under Cuban law and "its execution corresponds to the claimants as his heirs." *Id.* at 5. And his third, fourth, and fifth opinions all relate to estimating the fair market value of the Confiscated Properties for the purpose of calculating damages. *Id.* at 6–7.

But the Fernandez Affidavit omits just as much information as it includes. First, it fails to mention the FOCSA property at all, meaning that the only evidence in the entire record of the plaintiffs' ownership of that property comes from the Enrique Affidavit. Enrique Aff. ¶ 11(a)(vii). It also fails to address the statement in the translated version of the Enrique V. Will that only two Cuban properties were owned by the couple. At best, the Fernandez Affidavit may provide information regarding validity of the Deeds and Enrique V. Will under the Cuban law in effect at the time of their execution. But the problem at this stage is not the validity of the Enrique V. Will or the Deeds; the problem is that those documents do not prove that the plaintiffs own the Properties.

In short, the plaintiffs' exhibits tell a different story than the narrative contained in their own pleadings and memoranda. The exhibits also conflict with each other, and therefore do not shed any light into the current disposition of any of the Confiscated Properties. The exhibits do not constitute evidence satisfactory to the Court that the defendants are owners of the Properties.

## IV.    SUBJECT MATTER JURISDICTION UNDER THE FSIA

Title III does not independently confer jurisdiction over actions against foreign sovereigns. *See Exxon Mobil Corp. v. Corporacion CIMEX, S.A.*, 111 F.4th 12, 22 (D.C. Cir. 2024). The exceptions to sovereign immunity laid out in the FSIA are "exhaustive; if none applies to the circumstances presented in a case, the foreign state has immunity and the court

lacks subject-matter jurisdiction." *Id.* at 23 (citing *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 690 (D.C. Cir. 2022)). The plaintiffs bear the burden of overcoming the FSIA's presumption of sovereign immunity "by producing evidence that an exception applies." *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). Here, the plaintiffs invoke two of the FSIA's exceptions: the Commercial Activity Exception, which is set out in § 1605(a)(2), and the Expropriation Exception, set out in § 1605 (a)(3). However, as explained below, the plaintiffs have failed to meet their burden to show that either of the two exceptions upon which they rely are applicable.

**A. Plaintiffs Have Not Provided Evidence that the Commercial Activity Exception Applies**

Of the numerous FSIA exceptions to sovereign immunity found in § 1605, the so-called Commercial-Activity Exception is the "most significant . . . ." *Republic of Argentina v. Weltover*, 504 U.S. 607, 611 (1992). That section states in full that foreign states shall not be immune in any case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). The plaintiffs rely on the third clause of this exception, under which they must establish that their lawsuit is 1) "based upon . . . an act outside the territory of the United States"; 2) that was taken "in connection with a commercial activity" of a foreign state; 3) that "cause[d] a direct effect in the United States." *Weltover*, 504 U.S. at 611 (citing 28 U.S.C. § 1605(a)(2)). The Court will address each of these requirements for abrogation of sovereign immunity in turn. Because the Court finds that there is no evidence that the

defendants are actively trafficking in the Confiscated Properties and the plaintiffs have therefore failed to establish that their claims are "based upon" commercial activities, the Court will briefly explain that *if* such evidence were presented, the plaintiffs would still fail on the grounds that they have not shown that the alleged trafficking has a "direct effect" in the United States.[9]

## 1. Requirement 1: "Based Upon"

The Supreme Court has instructed that the "based upon" inquiry requires courts to "zero[] in" on the core of plaintiffs' suits. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015). That is, courts must identify the "particular conduct" that is alleged to be commercial activity, which they do "by looking at the 'basis' or 'foundation' for a claim." *Id.* at 33 (citing *Saudi Arabia v. Nelson*, 507 U.S. 349, 356–57 (1993)). As the D.C. Circuit has recently noted, "[t]he Supreme Court has repeatedly distinguished enabling conduct [such as expropriation] preceding a claim from activity forming the basis of the claim." *Exxon Mobil Corp.*, 111 F.4th at 31.

Here, the plaintiffs' suit is "based upon" the defendants' continued brokerage and management of the Confiscated Properties, acts that both constitute "trafficking" as defined in the Helms-Burton Act. Mot. for Default J. ¶ 26; *see also* 22 U.S.C. § 6023(13)(A)(i) (including in the definition of trafficking "broker[ing]" and "manag[ing]"). The "core" of the plaintiffs' allegation, therefore, is that the defendants are trafficking in the Confiscated Properties. They allege that four of the Properties—Rafaelita, Brisas del Mar, Playa Marbella, and Tarara—have been used to house members of the Cuban military, as a waterfront getaway for military officials and their families, and "as locations to earn profits from foreign tourism." Mot. for Default J. ¶ 27. They further allege that two of the Properties—Penas Altas and Bosque de la Habana—

---

[9] The Court readily acknowledges that the defendants' alleged actions would clearly constitute commercial activity in satisfaction of the second requirement of the commercial-activity exception.

"have also been used as tourism resorts and vacation spots for government officials and foreigners visiting Cuba." *Id.* ¶ 28. And they allege that the seventh Property, FOCSA, "is currently being used as an office for the Defendants CIMEX and I-CIMEX." *Id.* ¶ 29.

But while the "core" of the plaintiffs' allegation is that the defendants are trafficking in the Confiscated Properties, the only potential conclusion the Court could draw from the evidence presented is that the defendants expropriated the property. Notably, none of the evidence discussed by the Court *supra* indicates that the defendants are *actually trafficking* in the Confiscated Properties. The plaintiffs' Motion consists almost entirely of conclusory statements and citations to the Helms-Burton Act. The lack of satisfactory evidence for the plaintiffs' trafficking claims is most apparent in the section of their Motion ironically titled "Plaintiffs have provided sufficient evidence to establish that Defendants have trafficked in the Confiscated Property." Mot. for Default J. 20. That section, the entirety of which fits on barely more than one page of the Motion, begins by copying the language from the Helms-Burton Act defining "traffics." *Id.* (reproducing the language in 22 U.S.C. § 6023(13)). It then makes several conclusory statements with *zero* citations to any evidence that the defendants "[h]ave managed, received, possessed, obtained control of, or otherwise acquired or hold an interest in confiscated property," have "engaged in a commercial activity" and have "otherwise benefitted from confiscated property." *Id.* at 21. They finish the section by stating that "[t]he evidence presented" demonstrates that the defendants have trafficked in Confiscated Property in violation of 22 U.S.C. § 6082(a)(1)(A). *Id.*

Putting aside the fact that the plaintiffs do not cite to any actual evidence in the record that their allegations are true, the Court's own careful review of the exhibits submitted as evidence reveals no support for the plaintiffs' claims. Indeed, the evidence submitted only

purports to show that the plaintiffs are the owners of the Confiscated Properties, and, as discussed *supra*, it is insufficient to establish even that much. But nothing in the record shows that the defendants are actively or indeed have ever "trafficked" in the Confiscated Properties as defined by Title III. Based on the evidentiary record presented to the Court, it is entirely possible that the properties were expropriated in 1960 and have sat dormant ever since. In sum, the evidence of trafficking submitted by the plaintiffs consists entirely of unsupported conclusory statements and recitation of legal standards. Even taking as true that Cuba did expropriate the Confiscated Properties in 1960, that expropriation alone would not confer jurisdiction on this Court under the FSIA. While being the rightful owner of a confiscated property—as that term is defined by the Helms-Burton Act—may be a prerequisite to having such property "trafficked," it is not sufficient to establish that subsequent trafficking has occurred.

## 2. Requirement 3: "Direct Effect" on the United States

Even if the plaintiffs could provide evidence that their lawsuit is "based upon" a commercial activity, their arguments that the trafficking of their Confiscated Properties has a direct effect on the United States would still fail for lack of evidentiary support. The FSIA requires that the commercial activity undertaken by defendants have a "direct effect in the United States." 28 U.S.C. § 1605(a)(2). The *Weltover* Court rejected the notion that a "direct effect" had to be "substantial" and "foreseeable," instead holding that an effect that comes about "as an immediate consequence of the defendant's activity" is direct. *Weltover*, 504 U.S. at 618. The D.C. Circuit has further clarified that a direct effect "is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption." *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994).

For example, in *Bell Helicopter*, the Circuit rejected the argument that a direct effect flows to the United States from Iran's infringement of a U.S. company's intellectual property. 734 F.3d at 1184.  There, an American helicopter manufacturer and its Canadian affiliate operated a helicopter plant in Iran, which they abandoned after the Iranian revolution in 1979. *Id.* at 1177.  Iran subsequently began manufacturing helicopters at the abandoned plant, and the Iranian-built helicopters closely resembled those made by the plaintiffs during their operation of the plant. *Id.*  The American helicopter manufacturer sued Iran for infringement upon their "trade dress" in violation of the Lanham Act, 15 U.S.C. § 1051 *et seq*. *Id.*  They sought abrogation of sovereign immunity under the commercial activity exception, alleging that Iran's infringement on their intellectual property created a direct effect in the United States by harming them financially and reputationally. *Id.* at 1184.  Even though Iran's manufacture and sale of the helicopters took place completely outside the United States, the plaintiffs nonetheless argued that there was potential for customer confusion *in Iran* between the Iranian-made helicopters and the plaintiff-made helicopters. *Id.* at 1185.

Noting that the plaintiffs "did not offer evidence that Iran had sold or advertised [their helicopter] in the United States," the D.C. Circuit held that the harms were too remote and attenuated to meet *Weltover*'s requirement that the effect in the United States be "immediate." *Id.* at 1185–86 (citing *Weltover*, 504 U.S. at 618).  The Circuit observed that any confusion that did persist would not create enough of a disincentive *in the United States* to make further manufacturing of the helicopters by the plaintiffs unprofitable. *Id.* at 1185 (citing *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 892 F. Supp. 2d at 230, 232 (D.D.C. 2012)).

The plaintiffs here allege that the Confiscated Properties are being used both as a retreat for Cuban government officials and as a tourist destination for foreign travelers, including United

States citizens. Mot. for Default J. ¶¶ 26–28.[10] They advance two theories as to how the defendants' alleged trafficking causes a direct effect in the United States. First, the plaintiffs argue that "Congress explicitly found that trafficking in confiscated property has direct effects in the United States when it passed the [Helms-Burton] Act." Compl. ¶ 59 (citing 22 U.S.C. § § 6021, 6022, 6081). Putting aside the plaintiffs' failure to show any evidence of trafficking, the Court is not persuaded by their attempt to encapsulate the purposes of a statute with one conclusory sentence citing generally to three of its many sections. A review of the three sections cited by the plaintiffs does not convince the Court that Congress *explicitly* found that such trafficking creates a direct effect in the United States as defined by the FSIA and subsequent case law. While Congress made findings that the wrongful confiscation of property belonging to U.S. nationals by the Cuban government "undermines the comity of nations, the free flow of commerce, and economic development," 22 U.S.C. § 6081(2), it requires an inferential leap to equate those statements to a finding that the confiscation of property causes a direct effect in the United States. The Court declines any invitation to make such a leap.

The plaintiffs' second argument to establish a direct effect on the United States is even more attenuated. They claim that all the Confiscated Properties except FOCSA "have been used since the date of Confiscation and are currently still being used for domestic and international tourism." Mot. for Default J. 15. They then cite to tourism statistics from the Cuba Business Report purporting to show that "130,331 United States citizens travelled to Cuba" in 2023 alone, and approximately 300,000 Cubans living abroad traveled to Cuba, "many of which reside as permanent residents in the U.S." *Id.* (citations omitted). The plaintiffs state that an average of

---

[10] To the extent the Confiscated Properties are being used exclusively by Cuban Nationals, that usage falls closer to Iran's usage of the defendants' manufacturing facility and intellectual property in *Bell Helicopter* and would not be actionable.

2,399 Americans visited Cuba every month from January 2000 to December 2023, and that the defendants "market to and profit from the American tourism in the Confiscated Properties." *Id.*

Even accepting the statistics provided by the defendants as true, it would require yet another inferential leap for this Court to find that because 2,399 Americans have visited Cuba every year during a twenty-three-year period, some of those tourists necessarily stayed at one of the Confiscated Properties. The plaintiffs ask the Court to make this leap—which could determine whether the defendants' sovereign immunity is waived—simply from a few website statistics. This the Court will not do. If the plaintiffs want to satisfy the direct effects prong of the commercial activity exception's third clause, they need to provide satisfactory evidence that the defendants are trafficking in the Confiscated Properties.

**B. Plaintiffs Have Failed to Provide a Legal Theory of International Law and Therefore Cannot Invoke the Expropriation Exception**

In the alternative, the plaintiffs attempt to invoke the expropriation exception of the FSIA. Mot. for Default J. 16. As relevant here, the expropriation exception abrogates immunity of a foreign-sovereign defendant in any case

> in which rights in property taken in violation of international law are in issue and . . . that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

28 U.S.C. § 1605(a)(3). For the plaintiffs to prevail, then, they must show that "(1) rights in property are at issue; (2) those rights were taken in violation of international law; and (3) a jurisdictional nexus exists between the expropriation and the United States." *Nemariam v. Federal Democratic Republic of Ethiopia*, 491 F.3d 470, 475 (D.C. Cir. 2007). "In determining whether a claim involves rights in property that are recognized by and taken in violation of

international law, courts look to the 'customary international law of expropriation.'" *Exxon Mobil Corp.*, 111 F.4th at 27 (citing *Simon*, 77 F.4th at 1097).

The second of these statutory requirements is dispositive here: the plaintiffs have not shown that their rights in the Confiscated Properties were taken in violation of international law. In fact, the plaintiffs cite no sources of international law in their Motion for Default Judgment. Instead, they cite the D.C. Circuit's recent *Exxon Mobil* opinion, a case in which the Circuit held that the expropriation exception did not apply, and state that "the instant case is different." Mot. for Default 17. In *Exxon Mobil*, the D.C. Circuit considered whether Exxon could bring suit against the Cuban government for its uncompensated expropriation of various Exxon-owned oil and gas assets in 1960. *Exxon Mobil Corp.*, 111 F.4th at 19. The D.C. Circuit began its analysis by stating that Customary International Law ("CIL") is "[i]nternational law that derives from the practice of states and is accepted by them as legally binding." *Customary International Law*, BLACK'S LAW DICTIONARY (12th ed. 2024). The Circuit reiterated its previous holding that plaintiffs bear the burden of showing that their "legal theory 'has in fact crystallized into an international norm that bears the heft of customary law.'" *Exxon Mobil Corp.*, 111 F.4th at 27 (quoting *Simon*, 77 F.4th at 1097).

The Circuit ultimately held that the plaintiffs had failed to allege any property rights had been violated under the CIL of expropriation because their asserted property interest was as shareholders, not as direct owners of any property. *Id.* The plaintiffs in *Exxon Mobil* proffered several sources of international law sufficient to justify their position that shareholders have property rights in assets owned by a corporation, but the Circuit considered and rejected those sources. The court cited decisions by the International Court of Justice that directly rebuked Exxon's theory, and it stated that the "scattered authorities" cited by Exxon were "secondary" to

the judgments of the International Court of Justice. *Id.* The Circuit went on to say that even if they did afford Exxon's cited authorities more weight, most of those authorities either involved "governing law distinct from customary international law" or else were subject to treaties "whose terms do not necessarily reflect the parameters of customary international law." *Id.*

Unlike the plaintiffs in *Exxon Mobil*, the plaintiffs here to not even articulate a legal theory or try to tie it to international law. In fact, rather than cite to any source of international law here, the plaintiffs simply state that this case is "different" from *Exxon Mobil*. Mot. for Default J. 17. But even if they had argued a legal theory, their argument under the expropriation exception would still fail because they have not articulated how their legal theory has crystallized into an international norm. Even assuming the plaintiffs own the Confiscated Properties, their entire argument regarding the applicability of CIL is contained in one sentence: "the expropriation by the state of a business interest that renders the owner's beneficial and productive value of the property useless requires compensation to that owner under customary international law." *Id.* The Court is in no position to assess whether this is true, because the plaintiffs have identified no sources of international law tending to show that their theory "bears the heft" of CIL—as is it their burden to do. *Exxon Mobil Corp.*, 111 F.4th at 27. Without such supporting legal authority, this Court cannot hold that the expropriation exception to the FSIA abrogates the defendants' sovereign immunity.[11]

---

[11] The Court will briefly address one more potential flaw in plaintiffs' Motion. Section 6082(a)(4)(B) of the Helms-Burton Act provides that "[i]n the case of property confiscated before March 12, 1996, a United States national may not bring an action under this section on a claim to the confiscated property unless such national acquires ownership of the claim before March 12, 1996." 22 U.S.C. § 6082(a)(4)(B). Although the D.C. Circuit has not considered this part of the statute, at least one district court has held that "the United States national who acquired the ownership of the claim must be the same United States national who brings the action" and there "is no exception to this rule for inheritors." *de Fernandez v. MSC Mediterranean Shipping Co. S.A.*, No. 22-cv-6305-GHW, 2024 WL 5047492, at *12 (S.D.N.Y. Dec. 9, 2024) (citing *Glen v. Trip Advisor LLC*, 529 F. Supp. 3d 316, 328 (D. Del. 2021)).

The plaintiffs here did not acquire ownership of the claims before March 12, 1996. Rather, they acquired their alleged ownership of the claims on March 9, 2013, the date Enrique V. died. Ex. 1 at 5, Mot. for Default J.

## V.    Conclusion

For the foregoing reasons, the Court will **DENY** without prejudice plaintiffs' Motion [ECF No. 54] for Default Judgment.  The Court will further **REFER** the case to the Foreign Claims Settlement Commission to determine the validity of the plaintiffs' ownership interests in the Confiscated Properties as defined herein.  The Court will **ORDER** that the Commission provide a copy of its findings to this Court within sixty days of the completion of its work.  And the Court will **ORDER** that within sixty days of the issuance of the Commission's report, the plaintiffs shall file a renewed Motion for Default Judgment.

A copy of this Opinion and accompanying Order shall be delivered to the United States Department of Justice, Foreign Claims Settlement Commission, 441 G Street NW, Room 6330, Washington, D.C. 20579.

**IT IS SO ORDERED.**

Date:  _6_ March, 2025

Royce C. Lamberth
United States District Judge

---

Therefore, even if all their allegations were accepted as true and the FSIA abrogated the defendants' sovereign immunity, the plaintiffs have not provided any reason that the Court may adjudicate their claim.  The plaintiffs should address this deficiency in their subsequent motion for default judgment or risk the dismissal of their case for failure to state a claim upon which relief can be granted.